UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-cv-80789-VITUNAC

LIDIA BOLANDER, et al.,

      Plaintiffs,

vs.

TASER INTERNATIONAL, INC., et al.,

      Defendants.

_____/

```
FILED by _____ D.C.

    JUL 0 9 2009

  STEVEN M. LARIMORE
  CLERK U.S. DIST. CT.
  S.D. OF FLA. - W.P.B.
```

## ORDER

THIS CAUSE is before the Court on Order of Transfer (DE 127) from United States District

Judge Daniel T.K. Hurley transferring the above-captioned case to this Court "in its entirety . . . for

final disposition" upon consent of the parties. Pending before the Court is a Motion for Summary

Judgment (DE 44) filed by Defendants Frank Casarez, Steven Hynes, and the City of Delray Beach

("Delray Defendants"). Plaintiff filed a Response (DE 143) on May 28, 2009.[1] The Delray

Defendants did not file a Reply, and the time to do so has expired. The matter is ripe for review.

## BACKGROUND

On August 17, 2007, Lidia Bolander ("Lidia"), individually and as personal representative

of the estate of Timothy Bolander ("Bolander"), filed a Complaint (DE 1) against the Defendants in

the Seventeenth Judicial Circuit in and for Broward County, Florida. The Complaint arises out of

Bolander's death in Delray Beach following an incident involving Delray Beach Police officers' use

---

[1] Plaintiff later filed an amended response (DE 144-146) without leave of Court. The amended response was stricken (DE 147) as improperly filed without leave of Court, and was not considered.

of a taser on Bolander in the early morning hours of December 23, 2004. The Complaint alleges that in an attempt to subdue Bolander the officers discharged their taser devices into him, and that the tasing "rendered [Bolander] unconscious, caused him to go into ventricular fibrillation, and resulted in [Bolander's] death." The Complaint alleges that Bolander's death was caused either by the electrical current from the tasers alone, or in combination with drugs Bolander previously ingested.

Counts 1 through 10 of the Complaint allege causes of action based in products liability against Taser International, Inc., as manufacturer of the tasers, and DGG Taser, Inc., as distributor of the tasers to the City of Delray Beach. The remaining Defendants, the "Delray Defendants" are: (1) the City of Delray Beach, Florida; (2) Frank Casarez, individually and as agent and police officer of the City of Delray Beach, Florida; and (3) Steven Hynes, individually and as agent and police officer of the City of Delray Beach, Florida.

Counts 11, 12, and 13 of the Complaint allege causes of action against the City, Officer Casarez, and Officer Hynes, respectively, for violation of Bolander's civil rights based on 42 U.S.C. § 1983. Count 11 of the Complaint alleges that the City "created and allowed a policy, custom, or usage whereby its officers arrested individuals without probable cause, used excessive force when conducting arrests, and failed to give proper medical treatment to suspects who had been placed in custody and required medical treatment." Count 11 also alleges that the City failed to adequately train, supervise, or discipline its police officers in the appropriate use of force. Plaintiffs claim that the City's actions constituted violations of Bolander's Fourth and Fourteenth Amendment rights and resulted in his death. Counts 12 and 13 allege that Officers Casarez and Hynes used excessive force on Bolander in violation of Bolander's Fourth Amendment right to be free from unreasonable seizure and excessive force. Counts 12 and 13 allege the officers "failed to provide adequate medical care

2

to Kimbrough [sic] and failed to stop other Officer's [sic] from using excessive force against . . . Bolander."[2] Counts 12 and 13 also allege the officers' actions violated Bolander's Fourteenth Amendment rights to liberty, substantive and procedural due process, and the right to be free from unlawful seizure.

Counts 14, 15, and 16 of the Complaint allege causes of action against the City, Officer Casarez, and Officer Hynes, respectively, for wrongful death based on Florida law. In Count 14, Plaintiffs assert that the allegedly negligent and intentional acts of the officers in using excessive force on Bolander, failing to prevent other officers from using excessive force on Bolander, and failing to provide adequate medical treatment, caused Bolander's death. Plaintiffs allege in Count 14 that the City is vicariously liable for the actions of its officers. Counts 15 and 16, against the officers, allege that the officers' actions were "negligent and/or in bad faith, with malicious purpose and in a manner exhibiting wanton and willful disregard of human rights," and caused Bolander's death.

The Delray Defendants filed Answers (DE 6-8) denying the material allegations of the Complaint. The Delray Defendants raised the following affirmative defenses: (1) qualified immunity for the police officers; (2) that the decedent was the sole cause of his injuries; (3) self-defense by the police officers, and (4) reasonable use of force by the police officers. The Taser Defendants also filed Answers (DE 3,4) generally denying the material allegations of the Complaint and raising various affirmative defenses. On August 31, 2007, the Delray Defendants removed the case to this Court based on federal question jurisdiction (DE 1).

On August 25, 2008, the Delray Defendants filed the instant Motion for Summary Judgment

---

[2] The Court assumes, without finding, that Plaintiffs mean "Bolander" instead of "Kimbrough."

3

(DE 44), seeking summary judgment as to all claims. Plaintiffs filed voluminous materials in opposition that failed to conform with Local Rule 7.5 governing summary judgment and responses in opposition. Oral argument on the motions for summary judgment was reset several times and eventually cancelled. The case was later transferred to this Court on March 26, 2009 upon consent of the parties (DE 127). On May 13, 2009, this Court ordered Plaintiffs to file responses to the Defendants' motions for summary judgment that conformed with Local Rule 7.5. Plaintiffs filed a Response (DE 143) on May 28, 2009.

### PARTIES' CONTENTIONS

#### Delray Defendants' Motion for Summary Judgment (DE 44)

The Delray Defendants make five primary arguments in support of their motion for summary judgment. First, they argue that no violation of Bolander's civil rights occurred to give rise to liability because the officers did not use excessive force. Second, the Delray Defendants argue that even if a violation occurred, Officers Hynes and Casarez are entitled to qualified immunity. Third, the Delray Defendants argue there is no evidence of a custom or policy on the part of the City that violated Bolander's civil rights. Fourth, the Delray Defendants argue there is no viable wrongful death claim against the individual officers because there is no evidence they acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights. Last, the Delray Defendants argue there is no viable wrongful death claim based on negligence on the facts of this case.

#### Plaintiff's Response (DE 143)

In response, Plaintiffs argue that Officers Casarez and Hynes are not entitled to qualified immunity. Plaintiffs contend that the facts establish that Bolander committed no crime, was not a

4

threat to anyone, and was not actively resisting arrest, so that the officers' actions were not objectively reasonable and constituted excessive force. Plaintiffs claim that reasonable officers must have known they could not behave as Officers Hynes and Casarez did. Plaintiffs argue that the officers' conduct was so far beyond the border of acceptable force that the officers should have known they were violating the Constitution.

Plaintiffs also argue the City is liable on a theory of ratification. According to Plaintiffs, the City failed to conduct an investigation, and instead conducted only a cursory "force review" after the Florida Department of Law Enforcement ("FDLE") concluded its investigation of the incident. As to their wrongful death claims against the Defendants under section 768.19, Florida Statutes, Plaintiffs acknowledge that section 768.28, Florida Statutes, provides the individual officers immunity from liability for negligence. However, Plaintiffs argue that the City is responsible for the officers' negligence under the doctrine of respondeat superior. Furthermore, Plaintiffs claim the evidence shows that the officers acted with bad faith, malicious purpose, or wanton and willful disregard for Bolander's rights, for which the officers may be held individually liable.

## FACTS

The following are the facts viewed in the light most favorable to Plaintiffs, as the Court must view them at the summary judgment stage. See Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007).

Lidia Bolander obtained a temporary injunction for protection against domestic violence against her husband, Timothy, in late December of 2004. (DE 41-3; DE 44-5:267).[3] Despite the

---

[3] Citations to the evidence use the docket entry number followed by the page number in CM/ECF, not the page number of the document itself. For example, "(DE 44-5:267)" refers to docket entry 44, page number 267 as indicated at the top of the page.

5

injunction, on the evening of December 22, 2004, Bolander arrived at the marital residence and asked Lidia if he could sleep in the house. (DE 44-5:263). Lidia did not want to get in trouble for having Bolander in the house while she had the injunction against him, so she gave him permission to sleep on a patio swing in the back yard of the home. (DE 44-5:263-67). Lidia then went to bed in her own bedroom and fell asleep. (DE 44-5:273). Lidia later awoke in the night to hear strange noises from the back yard. (DE 44-5:271). She went to the window and saw Bolander rolling around on the ground and throwing himself into the fence. She also heard him making noises as if he were in a struggle with someone, even though Lidia saw no one else outside. (DE 44-5:275).

At 3:37 a.m., Lidia called 911 and asked for paramedics. (DE 69:2; DE 110-2:30). She informed the 911 operator that Bolander was "acting weird" and that he was "probably under [the] influence of drugs." (DE 69:2). She stated that Bolander was throwing himself into the fence. (DE 69:2). She also informed the 911 operator about her temporary injunction against Bolander (DE 69:3). The 911 dispatchers advised responders that a male subject was yelling and running into the fence, and that the complainant had a restraining order against the subject. (DE 69:8). The dispatchers sent out a signal "20", meaning that a person is mentally disturbed, and a signal "57", meaning drugs are involved. (DE 44-6:61). Officers Hynes and Casarez of the Delray Beach Police Department arrived separately to the Bolander home almost simultaneously, with Casarez arriving first at 3:46 a.m. (DE 44-8:114, DE 110-2:31). Fire Department paramedics also arrived and set up, or "staged", down the street from Bolander's house to wait for police to make the situation safe. (DE 70:38).

Both officers were armed with police department-issued M26 Taser devices. (DE 44-8:114).

6

Tasers generally can be discharged in "probe deployment" mode, or "drive-stun" mode.[4] (DE 110-2). In probe deployment mode, the taser uses a compressed nitrogen cartridge to fire two probes at a subject. (DE 110-2; DE 76). The probes are attached to the taser by wires, through which an electrical current runs that causes neuromuscular disruption that incapacitates a subject once the probes make contact. (DE 44-8:37-38). In drive-stun mode, the nitrogen cartridge is taken off the taser and the electrical current runs only between two electrodes approximately 1 ½ inches apart at the front of the taser. (DE 44-8:38-39). The taser does not fire probes in drive-stun mode, but is applied directly to the subject's body. (DE 110-2). Both officers were certified in the use of a taser. (DE 73:5-11). Hynes was trained that application of a taser in probe deployment mode causes contraction of the muscles of the body that a person controls, but does not affect smooth muscle such as the heart. (DE 44-8:38). Hynes was also trained that in drive-stun mode, where there is no deployment of probes, the taser is strictly a pain compliance technique, causing some pain but no neuromuscular incapacitation of a subject. (DE 44-8:38).

The Delray Beach Police Department's written policy on the training and use of tasers at the time of the incident, General Order 2003, categorizes use of a taser as "ordinary force". (DE 73:14). The policy defines the M26 taser as "[a] less-than-lethal Conducted Energy Weapon that uses propelled wires to conduct energy to a remote target, thereby controlling and affecting the central nervous system of the body." (DE 73:13). The policy "allow[ed] the deployment of the [taser] as

---

[4] The Court notes that Plaintiffs filed a supplement to the report of their expert cardiac electrophysiologist, Menashe Waxman, M.D., in which Dr. Waxman opines on January 30, 2009, that he recently became aware of two other "modes" in which a taser may be used. Dr. Waxman refers to these as "modes 3 and 4". Waxman's additional "modes" describe ways in which the taser can deliver electricity to the body if only one taser probe makes contact with the body instead of both, when the taser is fired in probe deployment mode. Dr. Waxman opines that "modes 3 and 4" were the "modes" used by the Defendant officers, and that it severely impaired Bolander's ability to breathe. Assuming Bolander was affected by the tasers as described in Dr. Waxman's statement does not change the Court's conclusion here.

a defensive discipline, which would limit the chance of injury to the subject and would not, by design, cause great bodily harm." (DE 73:13; 44-8:48). Officer Hynes testified in his deposition that he understood use of a taser to be ordinary force, meaning that it would not by design cause bodily harm. (DE 44-8:48).

As Officer Casarez arrived at the scene, Bolander ran across the street and into the yard across from Casarez' police car. (DE 70:51; DE 71:28). Hynes then arrived, and saw Bolander proceed to "tackle" the front fender of Casarez' police car, fall down, and get back up. (DE 44-8:114, DE 70:54).[5] Casarez had already gotten out of his car. Casarez ordered Bolander to, "Get back." (DE 70:53). Casarez yelled, "Taser," and discharged his taser in probe deployment mode at Bolander, but only one of the probes hit Bolander in the chest (DE 44-8:114, DE 70:53; DE 102-2; DE 104-2). Casarez looked at Hynes and yelled, "Misfire." (DE 44-9:15). Casarez, while fumbling with his taser, ordered Bolander to get on the ground. (DE 70:55). Hynes also then ordered Bolander to, "Get down on the ground." (DE 44-8:114). Bolander was snarling and making grunting sounds. (DE 44-8:27). Bolander did not get on the ground, but took a few steps back toward his yard. (DE 70:55). Hynes then discharged his taser in probe deployment mode from eight to ten feet away, striking Bolander in the chest with the taser probes (DE 44-8:115, 44-9:7).

Bolander backed up after being struck by the taser probes and fell into his front yard, rolling

---

[5] In their statement of material facts (DE 141-2), Plaintiffs cite the sworn statement given by Lidia Bolander to the FDLE in support of the proposition that "Lidia Bolander saw the entire incident. Bolander did not jump over, roll over, or attack Casarez' police car." An examination of the cited statement reveals that Plaintiffs' characterization is not accurate. Lidia did not state to FDLE that Bolander did not jump over or attack the police car, but only that she did not see Bolander jump over the car. Specifically, Lidia stated: "And when [Bolander] saw [the police spotlight], he ran kind of to the neighbor's yard from here and then the cop got out of the car and he did say that [Bolander] jumped over the car. I didn't see that. Maybe I just missed it . . ." (DE 71:19)(emphasis added). In her deposition, Lidia testified she was sure that Bolander did not jump on the police car, although when police arrived he did jump and slide over his car that was parked in the driveway of the home. (DE 44-5:239)(emphasis added). Lidia did not say in her sworn statement that Bolander did not attack or "tackle" the police car.

on the ground and ripping the wires from the taser out of the taser device. (DE 44-8:115). Hynes and

Casarez then closed in on Bolander and attempted to handcuff him. (DE 44-8:115). Bolander

struggled with the officers and resisted.[6] (DE 44-8:115). The officers continuously instructed

Bolander to stop resisting. (DE 44-8:115). Officer Hynes discharged his taser in drive-stun mode

repeatedly into Bolander's lower back and thigh as the officers attempted to get control of Bolander's

hands to place him in handcuffs.[7] (DE 44-8:102).

The use of the taser on Bolander in drive-stun mode was ineffective, so the officers attempted

to use a shoulder-lock technique. (DE 44-8:23). Officer Hynes holstered his taser and attempted to

gain control of Bolander's right arm as Bolander continued to struggle. (DE 44-9:18). There was

no further taser use after Hynes holstered his taser. (DE 44-9:18). As Hynes attempted to control

Bolander's arm, Bolander struck Hynes in the head with his knee. (DE 44-8:115; DE 44-9:19). The

officers succeeded in placing a handcuff on Bolander's right wrist, but Bolander freed his right arm

and the swinging ratchet struck Hynes in the forearm, causing several small cuts. (DE 44-9:20).

Bolander was on his stomach. As the officers tried to apply their weight to Bolander from the top,

Bolander lifted both officers off the ground as if doing a push-up. (DE 44-8:115). Hynes swept

---

[6] Plaintiffs also cite Lidia's statement to FDLE for the assertion that "Bolander was not actively resisting arrest or struggling." (DE 141-2 at 32). Again, an examination of Lidia's actual statement to the FDLE reveals that it fails to support Plaintiffs' factual assertion. Lidia stated only that she could not tell whether Bolander was resisting the officers or not as Bolander was on the ground and the officers tried to handcuff him. Lidia stated: "[Bolander] was laying down on the ground and I guess he was not cooperating." (DE 71:19). Later in her statement, Lidia again states that she could not tell whether Bolander was moving because he had the two large officers on top of him.

[7] According to Hynes, he only used the taser on Bolander three times in drive-stun mode, and it was impossible to maintain contact with Bolander's body as Bolander struggled. (DE44-8:59). However, the computer download report from Hynes' taser shows that the trigger was pulled eleven times in a sixty-one second period. (DE 110-2:78). Taking the evidence in the light most favorable to the Plaintiffs, the Court assumes that Hynes' taser made contact with Bolander in drive-stun mode ten times after the initial taser application in probe deployment mode.

Bolander's right arm out from under him, bringing Bolander back to the ground, and the officers then successfully put Bolander's left wrist in the handcuffs to join the right. (DE 44-9:22).

From her house, Lidia could not see the officers attempting to handcuff Bolander because the view of the three men from her home was obstructed by bushes in the yard. (DE 44-5:314). Lidia went outside after she heard the sound of the taser, walked to within ten feet of the officers, and saw Bolander on his hands and knees on the ground and the officers standing to either side of him. (DE 44-5:314). One of the officers instructed her to go back inside, and she went back inside the house. (DE 44-5:348). Lidia did not see Bolander struggle with the officers and did not see the officers handcuff Bolander. (DE 44-5:345-47). The period of time Lidia actually viewed her husband and the officers while she was outside was fifteen seconds. (DE 44-5:335).

After Bolander was handcuffed, he appeared to lose consciousness. (DE111-2:285). At 3:49:10 a.m., Casarez radioed dispatch that Bolander was "in custody." (DE 110-2:31). Dispatch responded that "F.D.[8] is trying to locate you now." (DE 69:10). The officers carried Bolander toward the paramedics, staged down the block approximately 200 yards away. (DE 111-2:285). The paramedics made patient contact with Bolander at 3:51:56 a.m. (DE 110-2:35; DE 44-6:57). The paramedics determined that Bolander was not breathing. (DE 70:7). The paramedics began working on Bolander and initiated CPR and other measures in an attempt to save his life. (DE 70:8). Bolander was taken to Delray Medical Center, and eventually pronounced dead at 4:52 a.m. (DE 41-11:1).

Dr. Stuart Graham, from the Office of the Medical Examiner, conducted an autopsy on Bolander. Dr. Graham noted four sets of thermal burn injuries on Bolander's lower back, and

---

[8] "F.D." refers to Fire Department paramedics.

another set on his upper right chest. (DE 44-10:88). The autopsy revealed five baggies of cocaine in Bolander's stomach. (DE 44-4). The baggies had broken in his stomach. (DE 44-4). Dr. Graham ruled that cocaine toxicity caused Bolander's death. (DE 44-4). Plaintiffs's expert, Dr. Menashe Waxman, M.D., a cardiac electrophysiologist, states that Bolander died from the tasing he sustained in conjunction with the cocaine in his body, and that Bolander would not have died if he had not been tased.[9] (DE 55:15). Dr. Waxman did not conduct an autopsy.

The FDLE conducted an investigation of the incident the day of Bolander's death. The FDLE interviewed Lidia Bolander, Officer Casarez, a neighbor[10], and the paramedics who responded to the scene. (DE 70; DE 71). The Delray Beach Police Department conducted a "force review" of the incident, in which the officers' reports describing the use of force were forwarded up the chain of command and reviewed at each level. (DE 136-2:18; DE 44-2). The reviewing officers concluded that Officers Hynes and Casarez used necessary force in accordance with Department policy and training. (DE 44-2:3). The Delray Beach Police did not conduct a formal investigation of the incident. (DE 136-2:18).

## DISCUSSION

The issue before the Court is whether the Delray Defendants are entitled to summary judgment. Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating a

---

[9] Although this point is disputed, for the purposes of this motion the Court accepts Dr. Waxman's assertion as true.

[10] A neighbor, Kathy Coon, gave a sworn statement to FDLE stating that she heard the officers telling Bolander, "Get down. Get down." (DE 71). She did not see the arrest.

summary judgment motion, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

The moving party bears the burden of proving that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of material fact if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the moving party satisfies its burden of demonstrating the absence of a genuine issue of material fact, then the burden shifts to the nonmoving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Fed.R.Civ.P. 56(e)). In summary judgment proceedings, the court must view the evidence and all factual inferences therefrom in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in favor of the non-movant. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Skop, 485 F.3d at 1136.

First, the Court will address Plaintiffs' claims under 42 U.S.C. § 1983. The Court will then address Plaintiffs' wrongful death claims under Florida law. In each section, the Court will begin by discussing the claims against the individual officers before turning to the claims against the City.

A. Plaintiffs' § 1983 Claims Against the Officers

Plaintiffs claim Officers Hynes and Casarez are liable under 42 U.S.C. § 1983 for using excessive force against Bolander in violation of the Fourth Amendment. The Officers claim they are entitled to qualified immunity.

1. Excessive Force

The Fourth Amendment includes the right to be free from excessive force during an arrest. Graham v. Connor, 490 U.S. 386, 394-95 (1989). In Graham, the Supreme Court recognized that the right "to use some degree of physical coercion or threat thereof" comes with the right to make an arrest or investigatory stop. 490 U.S. at 396. The Court held that claims under 42 U.S.C. § 1983 that law enforcement officers used excessive force in seizing a person should be analyzed pursuant to a Fourth Amendment standard of "objective reasonableness." Id. at 395. In making the determination whether the level of force was reasonable, a court will balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396.

The appropriate inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying motivation." Id. The court must determine "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). In the Eleventh Circuit, "courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (quoting Lee, 284 F.3d at 1198). In Graham, the Supreme Court instructed that proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. The test does not include a subjective prong evaluating the motivations of the officers in applying force

13

in good faith or with malicious intent. Id. at 397-98.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Id. at 396-97. Furthermore, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396; see also Rodriguez v. Farrell, 280 F.3d 1341, 1352-53 (11th Cir. 2002) ("We do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act"). "The critical inquiries for summary judgment purposes are what the involved officers knew, what they observed, and what they had reason to believe." Magee v. City of Daphne, 2006 WL 3791971 *1 n.6 (S.D. Ala. 2006). The Eleventh Circuit recognizes, and this Court takes judicial notice, that "the typical arrest involves some force and injury." Rodriguez, 280 F.3d at 1351.

The most important factor in evaluating Plaintiffs' excessive force claims with respect to the need for force and amount of force used is that Bolander ignored police commands and actively physically resisted the officers' attempts to subdue him. Plaintiffs do not argue that the police use of a taser, in and of itself, is evidence of excessive force. Importantly, the Eleventh Circuit has found a police officer's use of a taser reasonably proportionate to the need for force in situations where the subject who was eventually tasered put up little or no active physical resistance to officers at all. Draper, 369 F.3d at 1278.

In Draper, a deputy sheriff conducted a traffic stop of a tractor trailer driven by Draper. After instructing Draper to meet him at the back of the truck, the deputy ordered Draper to retrieve documentation from the truck. Id. at 1273. Draper became verbally belligerent and refused five

14

separate orders to retrieve the requested documentation. Id. Draper "was belligerent, gestured animatedly, continuously paced, appeared very excited, and spoke loudly." Id. After the deputy's fifth order went ignored, the deputy discharged his taser at Draper in probe deployment mode. Id. Backup officers closed in and handcuffed Draper. Id. at 1274.

In holding that the deputy's use of the taser was reasonably proportionate to the need for force, the Eleventh Circuit stressed Draper's belligerent and uncooperative demeanor, and his refusal to obey the deputy's orders. Id. at 1278. The court also observed that "a verbal arrest command accompanied by attempted physical handcuffing . . . may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or [Deputy] Reynolds would be seriously hurt." Id.; see also Buckley v. Haddock, 292 Fed.Appx.791 (11th Cir. 2008) (unpublished) (holding use of taser reasonable at traffic stop encounter where handcuffed Plaintiff sat down, kept his body limp, and refused to comply with police order to stand up).

Here, the officers' decision to discharge their tasers in probe deployment mode was reasonable. The officers had witnessed Bolander run across the yard and "tackle" a police car. Bolander failed to comply with two orders to get on the ground, and was snarling and grunting incoherently. The officers were not required to attempt to handcuff Bolander, a decision they could reasonably believe would result in a violent physical struggle, before resorting to using their tasers. See Draper, 369 F.3d at 1278. The officers attempted to handcuff Bolander when he went to the ground after being hit with the taser the first time, in probe deployment mode. Bolander struggled with the officers on the ground for several minutes, kicking Officer Hynes in the head with his knee, and striking him on the arm with a loose handcuff. Bolander showed a great deal of strength, and actually performed a push-up as both officers attempted to subdue him by applying their weight on

15

top of him.

Even assuming that Officer Hynes tased Bolander ten times in drive-stun mode in an attempt to subdue him does not change the analysis. Police generally may not continue to use force on a subject who is under control and not fleeing or resisting arrest. See, e.g., Galvez v. Bruce, 552 F.3d 1238, 1243 (11th Cir. 2008) (holding jury could find excessive force where police slammed subject into concrete structure several times even though subject was already handcuffed and offered no physical resistance); Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002) (holding police used excessive force in slamming suspect's head down on trunk of car where suspect was already secured in handcuffs and not attempting to flee or resist); Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000) (holding police used excessive force in severely beating handcuffed individual who did not resist, struggle or attempt to flee).

This case does not present a situation where police used force on individual who was already restrained and compliant. There is no evidence the officers tased Bolander after he was handcuffed, and Plaintiffs do not allege the officers used excessive force on Bolander after the point at which they had him in handcuffs. See Crenshaw v. Lister, 556 F.3d 1283, 1293 (11th Cir. 2009) (finding officer did not use greater force than necessary in failing to call off police dog prior to handcuffing plaintiff, despite fact the dog bit plaintiff thirty-one times, where officer could reasonably believe plaintiff was armed and might resist). The undisputed evidence demonstrates the officers tased Bolander as part of their attempts to handcuff him after he went to the ground after being hit with the taser the first time. Thus, Bolander's failure to respond to orders and his physical resistance to the officers justified the continued use of the taser.

The severity of the crime at issue in this case also weighs in favor of the officers. The

16

officers received information that Bolander was present at the marital home in violation of a temporary injunction for protection against domestic violence. This information provided probable cause to arrest Bolander, as the officers could reasonably believe, under the totality of the facts and circumstances known to them, that Bolander had committed or was committing a crime. See Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (describing probable cause standard as whether facts and circumstances of which officer has reasonably trustworthy information would cause prudent person to believe suspect has committed, is committing, or is about to commit an offense).

Plaintiffs argue that whether Bolander was in violation of the temporary injunction for protection against domestic violence is a disputed issue of fact because Bolander had Lidia's permission to be on the premises. The Court rejects this argument as irrelevant. Under section 741.31(4)(a), Florida Statutes, the crime of violation of a domestic violence injunction, including "[g]oing to, or being within 500 feet of, the petitioner's residence," is a first-degree misdemeanor punishable by up to one year in jail. The language of the temporary injunction for protection against domestic violence specifically warns that "[a]ny violation of the injunction, *whether or not at the invitation of Petitioner or anyone else*, may subject Respondent to civil or indirect criminal contempt proceedings, including the imposition of a fine or imprisonment." (DE 41-3) (emphasis added). The responding officers had no knowledge regarding Bolander's permission to be present at the residence, only that Bolander was in violation of the temporary injunction and acting erratically.

Furthermore, the officers here could reasonably believe that Bolander posed a danger to himself and others, or might attempt to run away, based on the information they received and the events they observed. The officers received information that Bolander had earlier been throwing himself into a fence. Upon arriving at the scene, the officers witnessed Bolander run across the street

17

and throw his body into Casarez' police car. The Court finds disingenuous Plaintiffs' suggestion that there is no evidence that Bolander was trying to injure himself, in light of Lidia's own descriptions of Bolander's behavior that prompted her 911 call. Bolander's subjective motivations in throwing himself into the fence, the police car, and running around erratically are irrelevant. Additionally, the officers could reasonably believe Bolander posed a danger to them or to himself based on his refusal to follow orders to get on the ground. The information the officers had before their arrival, combined with their own observations of Bolander's behavior upon their arrival at the scene, made it reasonable for the officers to believe Bolander posed a danger to them, himself, or others, or that he might run. This factor weighs in favor of the officers.

The factor discussed in Draper, and other Eleventh Circuit cases, addressing extent of the injury inflicted, is difficult to properly evaluate in this case because Bolander died following the application of force that the Delray Beach Police Department, and the officers involved, considered "ordinary" and non-deadly. Plaintiffs point to no case, and the Court is unaware of any, in which the use of a taser has been held to be deadly force per se. Furthermore, the Court notes that under Florida law, the use of a device that stuns or temporarily incapacitates a subject without penetrating the body is specifically excepted from the definition of "deadly force." § 776.06(2)(a), Florida Statutes (1999).[11]

The Complaint alleges that Bolander died from being tased. Plaintiffs' allegation is

---

[11] The statute provides:

The term "deadly force" does not include the discharge of a firearm by a law enforcement officer or correctional officer during and within the scope of his or her official duties which is loaded with a less-lethal munition. As used in this subsection, the term "less-lethal munition" means a projectile that is designed to stun, temporarily incapacitate, or cause temporary discomfort to a person without penetrating the person's body.

inconsistent with the opinion of Plaintiffs' expert, Dr. Waxman, that Bolander died from the combination of the taser and the cocaine in his system.  See Crenshaw, 556 F.3d at 1292 (court credits exhibits where exhibits contradict conclusory allegations of a pleading).  Dr. Waxman's conclusion is the only evidence Plaintiffs note in support of their argument that Bolander died from the tasing.  Plaintiffs have offered no evidence that the officers knew or should have known the taser is a deadly weapon, nor have Plaintiffs offered evidence that the taser is per se a deadly weapon.  The police here could not assume that the likely consequence of using the non-deadly force they applied to Bolander would cause death.  In summary, the uncontroverted evidence is that the defendant officers used a non-deadly weapon in an attempt to subdue Bolander, who was high on cocaine, and Bolander died after the use of force ceased.  The fact[12] that the taser, combined with the cocaine in Bolander's body, caused his death does not transform the use of the taser into excessive force in this case.

Oliver v. City of Orlando, 574 F.Supp. 2d 1279 (M.D. Fla. 2008), involved police use of a taser on a subject who later died, and provides a useful contrast of factors relevant to the present case.  In Oliver, Officer Fiorino of the Orlando police encountered Oliver in the median of the street attempting to flag her down.  574 F.Supp.2d at 1281.  Oliver tried to get in the police car when Fiorino approached.  Id.  Oliver complied with several commands to back up, both before Fiorino exited her car and after she got out of the car to investigate.  Id.  Oliver was acting fidgety, talking loudly, and making gestures with his hands.  Id. at 1282.

Another officer on the scene, Burk, tried to guide Oliver across the street to the sidewalk,

---

[12] Again, the Court notes this proposition is disputed but is accepted as true for summary judgment purposes.  In his deposition, Dr. Graham, the medical examiner who conducted the autopsy on Bolander testified there was "no credible basis to assert that the application of the taser specifically contributed to the death of the decedent."  (DE 44-10:78).

"but Oliver stopped in the middle of the street and began to babble incoherently." Id. Burk then tried to force Oliver across the street, but Oliver pulled away. Id. Burk held on to Oliver's shirt as Oliver flailed his arms and attempted to push him away. Id. At that point, Fiorino discharged her taser at Oliver in probe deployment mode, hitting him in the abdomen. Id. Fiorino continued to tase Oliver in probe deployment mode two or three more times as Oliver lay on the ground, even loading a replacement cartridge into her taser after one of the taser wires became disconnected. Id. Fiorino tased Oliver until he stopped moving. Id. Oliver was put in an ambulance and suffered a seizure. Id. at 1283. He was taken to the hospital, but his health deteriorated and he died several weeks later. Id.

Oliver's survivors brought a § 1983 excessive force claim against Orlando and the officers. Id. at 1281. The court found Officer Fiorino's first use of the taser was not unreasonable because Oliver created a danger to himself and others when he attempted to break free of Officer Burk as Burk guided him across the street. Id. at 1285. However, in finding that Fiorino used excessive force as to the subsequent taser discharges, the court found it significant that Oliver had complied with the officer's instructions except for the street crossing, presented no danger to himself or others, the officers did not order Oliver to stay on the ground, and the officers made no attempt to restrain Oliver by conventional means after tasing him the first time. Id. at 1286-87; see also McNally v. Eve, 2008 WL 1931317 (M.D. Fla. 2008) (finding no qualified immunity for officers who tased Plaintiffs who posed no threat to officers or others, never resisted or attempted to flee, and committed minor crime of noise violation).

The relevant factors the Court examined in Oliver militate in favor of the opposite result here. The use of the taser here, taken in the light most favorable to Plaintiffs, was significantly less severe

than that in Oliver. Unlike the use of the taser in the incapacitating probe deployment mode at least four times that occurred in Oliver, Officers Hynes and Casarez only used their tasers in probe deployment mode twice, and then followed up in drive-stun mode for all subsequent applications. Furthermore, unlike in Oliver, Bolander failed to comply with the officers' orders to get on the ground before he was tased initially and failed to obey later orders to stop resisting during the attempt to handcuff him. Unlike in Oliver, the officers here could reasonably conclude Bolander posed a danger to them, himself, or others. Whereas the officers in Oliver made no attempts to handcuff or restrain Oliver by conventional means, the officers in this case closed in on Bolander in an attempt to handcuff him after the first use of the taser.

The Court notes that Plaintiffs rely on the opinion of their expert witness, George Kirkham, in support of their contentions that the police officers in this case used excessive force. Specifically, Kirkham opines that this situation was not appropriate for the use of a taser and that the taser shocks after Bolander fell to the ground constituted excessive force. (DE 65:5). However, the Court declines to consider Kirkham's opinion as to the legal issue the Court must decide here. At the summary judgment stage, the issue of whether the officers used excessive force based on the undisputed facts in the light most favorable to the Plaintiffs is a question of law for the Court. See U.S. v. Manley, 893 F.2d 1221, 1225 (11th Cir. 1990) (affirming exclusion of medical expert's opinion on ultimate issue); Anderson v. Suiters, 499 F.3d 1228, 1237 (10th Cir. 2007) (noting that while testimony on an ultimate issue of fact is permissible under Federal Rule of Evidence 704, testimony upon ultimate issue of law is disfavored).

The Court concludes that the actions of Officers Hynes and Casarez, viewed in the light most favorable to Plaintiffs, did not constitute excessive force under the totality of the circumstances. The

21

finding of a lack of excessive force also disposes of Plaintiffs' claims against the officers in Counts 12 and 13 for failing to prevent the use of excessive force.

### 2. Qualified Immunity for Excessive Force

"Qualified immunity protects municipal officers from liability in § 1983 actions as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The first question in a qualified immunity analysis is whether the officers were acting in their discretionary authority. Id. Here, Plaintiffs agree Officers Hynes and Casarez were acting within their discretionary authority.

The burden then shifts to the Plaintiffs to show that the officials are not entitled to qualified immunity. Id. Courts use the two step process set forth by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001) in analyzing claims of qualified immunity. Qualified immunity is available to certain officials for actions taken in the course of carrying out their official duties unless a plaintiff is able to establish that (1) the facts taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a constitutional right and (2) the right was clearly established. Robinson v. Arrugueta, 415 F.3d 1252, 1255 (11th Cir. 2005) (citing Saucier, 533 U.S. at 201). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

The Court has already concluded the officers' actions did not amount to excessive force. The Delray Defendants are therefore entitled to summary judgment on the excessive force claims contained in Counts 11, 12, and 13 of Plaintiffs' Complaint. However, even if Defendants used excessive force, the Court finds the officers would still be entitled to qualified immunity on Plaintiffs'

§ 1983 claims because Plaintiffs have failed to show that Defendants violated a clearly established right.

> A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right, . . . (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right, . . .; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

Lewis, 561 F.3d at 1291-92 (citations omitted).

Plaintiffs admit there was no case with materially similar facts at the time of the incident that could have put the officers on notice that their conduct was unconstitutional. Plaintiffs do not direct the court to any broad statement of principle establishing the violation of a constitutional right. Plaintiffs base their argument against qualified immunity on the assertion that the officers' conduct was so egregious that any reasonable officer would know that it violated the constitution. The Court rejects Plaintiffs' argument, having already concluded for the reasons discussed above that the officers did not violate Bolander's constitutional rights.

### 3. Lack of Probable Cause

Plaintiffs allege the officers lacked probable cause to arrest Bolander. On a false arrest claim, "all that is required for qualified immunity to be applicable to an arresting officer is 'arguable probable cause to believe that a person is committing a particular public offense.'" Scarborough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001) (quoting Redd v. City of Enterprise, 140 F.3d 1378, 1384 (11th Cir. 1998)). Arguable probable cause exists "where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' the plaintiffs." Id. (quoting Redd, 140 F.3d at 1382). For reasons already discussed above, Officers Hynes and Casarez had more than arguable probable cause, as they

23

had actual probable cause to arrest Bolander for violation of the temporary injunction for protection against domestic violence. Actual probable cause is an absolute bar to a section 1983 claim of false arrest. Marx v. Gumbinner, 905 F.2d 1503, 1505-06 (11th Cir. 1990). The officers are therefore entitled to summary judgment on Plaintiffs' section 1983 claims based on false arrest, which are contained in Count 12 as to Officer Casarez, and Count 13 as to Officer Hynes.

>        4.      Failure to Provide Medical Treatment

Plaintiff's Complaint alleges, without further detail, that the officers failed to provide Bolander medical treatment. A claim for failure to provide medical treatment following the use of force requires the Plaintiffs to provide evidence the officers were deliberately indifferent to Bolander's injuries or that their inaction amounted to the unnecessary and wanton infliction of pain. See Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990); Washington v. Dugger, 860 F.2d 1018, 1021 (11th Cir. 1988). The length of time treatment is denied is not controlling. Brown, 894 F.2d at 1538.

Defendants point to Officer Hynes' deposition testimony that after handcuffing Bolander, the officers rolled him to a sitting position, stood him up, and began walking him to the waiting paramedics. Plaintiffs present Officer Casarez' Narrative Report Form (DE 11-1:185) in support of their factual assertion that Bolander became unconscious after being handcuffed and the officers actually carried him to the paramedics.[13] Plaintiffs also present evidence that over two and a half minutes elapsed from the time Officer Casarez radioed dispatch that Bolander was in custody to the

---

[13] The Court notes the evidence is unclear regarding exactly when Bolander became unconscious. Paramedic Kevin Sexton gave a statement that when he saw Bolander, the officers were carrying or dragging him under his arms but Bolander was still struggling. (DE 70:38). Paramedic David Priest stated that Bolander was "totally unconscious" as the officers brought him to the paramedics. (DE 70:7). Officer Hynes testified in deposition that Bolander was conscious and walking with the officers to the paramedics, and that he collapsed as the paramedics made contact with him. (DE 44-8:116).

24

time the paramedics radioed dispatch that they made patient contact with Bolander. It is undisputed, however, that the paramedics were staged down the block from the Bolander residence. In the same Narrative Report Form, Casarez approximates the distance from the Bolander residence to the paramedics as 200 yards. Plaintiffs offer no evidence, under their version of the facts, from which a trier of fact could find the officers took action or inaction amounting to deliberate indifference to Bolander's medical condition after placing Bolander in handcuffs. This Court finds, as a matter of law, that Plaintiffs have failed to offer evidence of a failure to provide medical treatment. The officers are therefore entitled to summary judgment on Plaintiffs' section 1983 claims based on failure to provide medical treatment, which are contained in Count 12 as to Officer Casarez and in Count 13 as to Officer Hynes.

B.    Plaintiffs' § 1983 Claim Against the City

The Court's finding that the officers did not violate Bolander's constitutional rights also precludes a successful § 1983 claim against the City. However, even if Plaintiffs had established a violation by the officers, Plaintiffs' claim against the City would still require dismissal because Plaintiffs have failed to show the alleged violations were the result of a City policy or custom. "A city may only be held liable under § 1983 when the injury caused was the result of a municipal policy or custom." Id. at 1291. In other words, assuming the officers *did* violate Bolander's civil rights, Plaintiffs may not succeed on a § 1983 claim against the City simply based on the doctrine of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95 (1978). "[T]o impose § 1983 liability on a municipality, a Plaintiff must show (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to those rights; and (3) that the custom or policy caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289

(11th Cir. 2004).

Plaintiffs' complaint mentions multiple different theories of municipal liability under § 1983. Plaintiffs allege the City had a policy or custom "whereby its police officers arrested individuals without probable cause, used excessive force when conducting those arrests, and failed to give proper medical treatment to suspects that had been placed in custody and required medical treatment." Plaintiffs also claim the City hired substandard officers and had a custom or policy where its officers failed to intervene when other officers used excessive force. Plaintiffs have failed to offer any evidence whatsoever of a custom or policy in order to overcome summary judgment on any of the above theories of recovery.

As to the failure to train, the Supreme Court holds that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). "To establish a city's deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" Lewis, 561 F.3d at 1293 (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)). A plaintiff may establish deliberate indifference on the part of the City by showing the City had notice of a pattern of prior incidents, or that "the likelihood for constitutional violation is so high that the need for training would be obvious." Id.

Here, Plaintiffs fail to offer argument, let alone evidence, in support of a "failure to train" theory of recovery against the City. In fact, the available evidence of training contradicts any such theory. Officer Hynes testified that the Delray Police Department trains officers four times a year on

26

the use of force, and that he received training in the safe use of the taser so as to "minimize the chances of injury to the suspect." (DE 44-8:36-37). Plaintiffs claim the City had notice of the dangerousness of restraining Bolander because Taser International training materials issued in 2003 warn not to sit on the back of a subject. A review of the training materials referenced by Plaintiffs shows that the materials actually warn not to sit on the chest of a subject.[14] Regardless, there is no evidence here that the officers sat on Bolander's back. In sum, Plaintiffs fail to show the training the Delray Beach Police received is deficient and how the City exhibited "deliberate indifference" to such deficiency.

In the response to Defendants' motion for summary judgment, Plaintiffs abandon the arguments addressed above and claim the City is liable on a theory of ratification because the City conducted what amounted to "no investigation" into Bolander's death. In support, Plaintiffs cite Sherrod v. Palm Beach County School District, 424 F.Supp. 2d 1341, 1344 (S.D. Fla. 2006) for the proposition that municipal liability under section 1983 may attach where "the final policymakers of the local governmental entity ratified a constitutionally impermissible decision or recommendation of a subordinate employee."

Leaving aside the question whether the chief of police is a final policymaker, Plaintiffs' ratification argument fails because ratification did not cause the alleged tort. In the seminal case of Monell, the Supreme Court cautioned that "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature *caused* the constitutional tort." (emphasis added); see also Milam v. City of San Antonio, 113 Fed.Appx. 622,

---

[14] Specifically, Plaintiffs' Statement of Facts quoted the training materials as stating, "Do not sit on the [back] of a subject!" The referenced sentence actually reads, "Do not sit on the chest of a subject!" (DE 110-2:95).

627 (5th Cir. 2004)("Policymakers alone can create municipal liability, and so any violation must be causally traceable to them, not just to their subordinates"). Plaintiffs cites Kimbrough v. City of Cocoa, 2006 WL 3335066 *8 (M.D. Fla. 2006) in support of his ratification argument. However, Kimbrough actually supports the conclusion that ratification is unavailable here as a theory of liability. In Kimbrough, the plaintiff alleged the city's failure to investigate Kimbrough's death following an alleged use of excessive force by police rendered the city liable. The court rejected Plaintiffs's theory, finding that "even assuming that the failure of the Chief of Police to conduct an internal investigation constitutes a deliberately indifferent act by a final policymaker, it could not have been the cause of Kimbrough's injuries." Id. at 7.

Here, Plaintiffs allege an incident of excessive force committed by the Delray Beach Police. Even if the City conducted no investigation after the incident, Plaintiffs could not show that the failure to investigate caused the use of excessive force. A different result would simply result in respondeat superior liability.

Summary judgment in favor of the City on all of Plaintiffs' § 1983 claims is therefore appropriate.

C. Wrongful Death Claims Against the Officers Under Florida Wrongful Death Act[15]

"The Florida Wrongful Death Act provides that a wrongful death action may be maintained on behalf of statutory beneficiaries if the decedent was entitled to bring an action based on the wrongful event." Brown v. U.S., 838 F.2d 1157, 1151 (11th Cir. 1988). Under section 768.28(9)(a), Florida Statutes, the individual officers may be liable if they acted "in bad faith or with malicious

---

[15] Section 768.16 through 768.26, Florida Statutes.

28

purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."[16] In other words, the officers cannot be liable for negligence. Additionally, section 776.06(2)(b), Florida Statutes, provides immunity from civil and criminal liability for law enforcement officers for actions "arising out of the use of any less-lethal munition in good faith during and within the scope of his or her official duties."

Plaintiffs claim that there is sufficient evidence the officers used excessive force in violation of section 1983 and are therefore not entitled to immunity. In Florida, "[i]f excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." City of Miami v. Sanders, 672 So.2d 46, 47 (Fla. 3d DCA 1996). The battery claim based on excessive force is judged by evaluating the reasonableness of the force under the circumstances. Id. The Court has already determined both that the amount of force the officers applied under the undisputed circumstances of this case was reasonable and that Plaintiffs have failed to offer evidence to support a claim of failure to provide medical treatment. Summary judgment is appropriate in favor of Officers Casarez and Hynes on Counts 15 and 16 for wrongful death.

D. Wrongful Death Claim Against the City Under Florida Wrongful Death Act

Plaintiffs also argue the City is liable for the allegedly negligent actions of the officers under the doctrine of respondeat superior. Unlike causes of action under 42 U.S.C. § 1983, a municipality may be liable in respondeat superior for the negligent actions of its employees under the waiver of sovereign immunity in Florida's sovereign immunity statute:

---

[16] Section 768.28(9)(a) provides: "No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."

> As [section 768.28] has evolved, it appears the governmental entity is liable for all torts, negligent ones and intentional ones alike, unless they are committed outside the course and scope of one's employment or unless the actor was acting in bad faith or with a malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Richardson v. City of Pompano Beach, 511 So.2d 1121, 1123-24 (Fla. 4th DCA 1987).

Initially, the Court notes that Plaintiffs may not succeed against the City on a theory of respondeat superior based on the alleged negligence of the officers for the use of excessive force. Florida courts have held that there is no cause of action for negligent use of excessive force, because "excessive force necessarily involves the intentional tort of battery." Sanders, 672 So.2d at 47. Thus, "there is no cause of action for 'negligent' use of excessive force for injuries resulting from a lawful arrest." Id.; see also Lewis, 561 F.3d at 1294 (applying Florida law) (holding district court correctly found plaintiff failed to state claim for wrongful death because "it is inapposite to allege the negligent commission of an intentional tort, such as the use of excessive force"). Plaintiffs' wrongful death claim against the City fails to the extent it is based on negligence for the use of excessive force.

Plaintiffs argue the City is liable for the negligence of the officers since they put Bolander in a "zone of danger." Although Plaintiffs' argument on this issue is not well-defined, Plaintiffs appear to argue that negligent conduct on the part of the officers after the officers placed Bolander in custody caused Bolander injury for which the City is liable. Defendants argue that the City is immune from suit based on Florida's governmental immunity as explained in case law.

Despite the fact that a governmental entity may be vicariously liable for the negligence of its employees, Florida courts still recognize "a sphere of governmental activity immune from suit." Kaisner v. Kolb, 543 So. 2d 732, 733 (Fla. 1989). The first inquiry is whether " a common law or statutory duty of care existed that would have been applicable to an individual under similar

30

circumstances." Id. at 734. The duty must be one owed to the plaintiff individually rather than to the public generally. Seguine v. City of Miami, 627 So.2d 14, 17 (Fla. 3d DCA 1993).[17] If a duty of care exists, immunity may still apply under the "discretionary function exception" if the act of the governmental entity or its agent is discretionary in nature rather than operational. Kaisner, 543 So. 2d at 736. In sum, "a court must find no liability as a matter of law if either (a) no duty of care existed, or (b) the doctrine of governmental immunity bars the claim." Id. at 734.

Florida courts have recognized that governmental immunity under the discretionary function exception does not operate to shield a governmental entity from liability where police, having a subject in custody, affirmatively place that subject in danger and the subject sustains injury as a result. See Dept. Of Highway Safety and Motor Vehicles v. Kropff, 491 So. 2d 1252 (Fla. 3d DCA 1986) (holding no immunity applied for injury caused by officer's negligence during roadside stop); Walston v. Florida Hwy Patrol, 429 So. 2d 1322 (Fla. 5th DCA 1983) (recognizing liability for injury caused by officer's negligence during roadside stop); White v. Palm Beach County, 404 So. 2d 123 (Fla. 4th DCA 1981)(holding county not entitled to immunity from liability for violence and sexual abuse suffered by jail inmates). In Kaisner, the Supreme Court of Florida recognized that "under our case law, our courts have found liability or entertained suits after law enforcement officers took persons into custody, otherwise detained them, deprived them of liberty, or placed them in danger." 543 So. 2d at 734. "So long as petitioner was placed in some sort of 'custody' or detention, he is owed a common law duty of care." Id.

Defendants rely on Seguine in support of their assertion that the City is entitled to immunity.

---

[17] Seguine discusses the first inquiry, regarding whether a duty is owed, as a separate "public duty doctrine exception." The import is the same in that if no duty is owed to an individual plaintiff, the governmental entity may not be liable.

In <u>Seguine</u>, Miami police attempted to arrest Seguine for sexual assault. 627 So. 2d at 15-16. Seguine jumped into a canal to avoid arrest, refused police efforts to rescue him, and drowned himself. <u>Id.</u> In holding that the City of Miami was immune from liability, the court stressed that "no special tort duty ever arose in this case because the decedent was never put in police custody and accordingly was never affirmatively placed in a zone of danger by the police." <u>Id.</u> at 18.

Defendants' reliance on <u>Seguine</u> is misplaced because Plaintiffs assert injury occurring after Bolander was in police custody. However, the only record evidence is that the defendant officers tased Bolander and laid on him in an attempt to take him into custody. There is no evidence that the officers used the taser or any further physical force on Bolander after placing him in custody.

Summary judgment is appropriate in favor of the City on Count 14.

CONCLUSION

Based on the foregoing, it is ORDERED and ADJUDGED that:

1)     Defendants' Hynes, Casarez, and the City of Delray Beach Motion for Summary Judgment (DE 44) is GRANTED as to Counts 11 through 16 of the Complaint.

DONE AND ORDERED in Chambers at West Palm Beach in the Southern District of Florida this _____ day of July, 2009.

ANN E. VITUNAC
United States Magistrate Judge

Copies to:
All parties and counsel of record